Filed 1/20/21  P. v. Fernandez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C080861 |
| Plaintiff and Respondent, | (Super. Ct. Nos. STKCRFE20140008190, SF129708A) |
| v. | |
| JUSTO PULCIANO FERNANDEZ, | |
| Defendant and Appellant. | |

Defendant sexually molested two young girls.  On occasions in 2000 and 2001, defendant entered the room where his niece, N.D., was sleeping and touched her breasts and vagina.  N.D. was under the age of 14 at the time.  In October 2014, defendant touched the vagina of the victim J.D., who was also under the age of 14 at the time.  J.D. is unrelated to defendant and his molestation of her took place in a church parking lot.  A jury found defendant guilty of four counts of violating subdivision (a) of Penal Code

1

section 288[1] and found true allegations as to each count that defendant committed the same crime against multiple victims within the meaning of section 667.61, subdivision (e)(4).  The trial court sentenced defendant to an aggregate term of 60 years to life, consisting of four consecutive terms of 15 years to life.

On appeal, defendant asserts (1) that the trial court prejudicially erred in admitting, pursuant to Evidence Code section 1360, the entirety of video recorded interviews of the victims conducted by interviewers at the Child Advocacy Center (CAC).  Defendant asserts that the recordings should have been redacted to present the jury with only so much of the victim statements as actually "describ[ed] any act of child abuse," within the meaning of Evidence Code section 1360 rather than the entire interviews.  Defendant further asserts that (2) the trial court violated ex post facto principles in sentencing him on counts 2, 3, and 4, all of which involved N.D., under the version of section 667.61 that was effective at the time of sentencing rather than the version of that section that was in effect at the time of the 2000 and 2001 offenses.  According to defendant, because he was probation eligible in 2001, he did not qualify for life sentencing under the version of section 667.61 in effect at the time of those offenses.  Defendant also asserts that (3) the matter must be remanded for the trial court to exercise its discretion to sentence him to probation or to choose between concurrent and consecutive life sentences.

We conclude that the trial court properly admitted the full interviews conducted with the victims at CAC.  We further conclude that, contrary to defendant's contention, he was not statutorily eligible for probation under the sentencing scheme in effect at the time of his 2000 and 2001 offenses, and, consequently, he was properly sentenced under section 667.61.  However, we agree with defendant, and accept the People's concession, that, on this record, we cannot determine whether the trial court was aware it had the

---

[1]  Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

2

discretion to sentence defendant on counts 2, 3, and 4 to concurrent or consecutive sentences, and, in any event, the court did not state specific reasons for imposing consecutive sentences. We remand for resentencing, at which the trial court is to exercise its discretion to choose whether to impose concurrent or consecutive sentences on counts 2, 3, and 4, and, if it imposes consecutive sentences, to state its reasons for doing so. We will also order the correction of the abstract of judgment, and that, in resentencing defendant, the trial court impose all appropriate penalty assessments.

In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

Defendant was charged with four counts of lewd acts upon a child under the age of 14 (§ 288, subd. (a); counts 1-4). In count 1, the information alleged that, on or about October 11, 2014, defendant touched J.D.'s vagina over her clothes, and that J.D. was under the age of 14 at the time. In count 2, the information alleged that, in or about October 2000, defendant touched N.D.'s breasts, and that, at the time, she was under the age of 14. In count 3, the information alleged that, in or about January 2001, defendant touched N.D.'s breasts, and that, at the time, she was under the age of 14. In count 4, the information alleged that, in or about January 2001, defendant touched N.D.'s vagina, and that, at the time, she was under the age of 14. The information further alleged as to each count that defendant committed the same crime against multiple victims within the meaning of section 667.61, subdivision (e)(4).

**Incidents Involving Victim N.D.**

N.D. was an adult at the time of trial. When she was nine or ten years old, she frequently visited her Aunt S's house. Defendant, who was S's husband, and their two daughters (N.D.'s cousins) also lived in the house.[2]

N.D. testified that defendant would sneak into her aunt's room where N.D. was sleeping "and his hands would either go down my pants, underneath the underwears, and touch my genitalia, as well as there were incidents where he had me touch his genitalia." She testified that this occurred "for about five years," and that "it started at the age of five until I finally said something at the age of ten."

N.D. explained that when defendant touched her genitalia, she was referring to her vagina, and when she said defendant would have her touch his genitalia, she was referring to his penis, although she could "only recall one instance for that." Defendant touched her both over her clothing and under her clothing. Sometimes he touched her "skin-to-skin." He also touched her breasts, although, when he started, "it wasn't too developed so there wasn't much to touch."

N.D. testified that these incidents occurred "almost every time I visit[ed] my aunt. And I visited my aunt frequently. Almost every weekend or every other weekend." Sometimes defendant would not be able to touch N.D. when N.D. slept in her aunt's room; according to N.D, "it really would depend on his opportunity, whether she was really asleep or she wasn't."

---

[2] N.D. testified that her Aunt S was her mother's sister and that defendant had been S's husband, but that defendant was now S's former husband. When defendant testified in his defense, he testified that he and S were not divorced, although they stopped living together in 2006.

N.D. also recalled an incident when defendant "was eating a slice of melon and said that the taste of the melon would be similar to having to . . . taste my vagina."

Defendant warned N.D. that if she said anything, she would no longer be able to visit and see her aunt and her cousins. N.D. testified that she did not report defendant's conduct earlier because she feared that, if she did, she would no longer be able to go to her Aunt S's house, and her aunt was "like [her] second mother." At some point, when N.D. was in the fifth grade, she was at school speaking with a substitute teacher and some other children, and she brought the issue up in conversation. After N.D. disclosed the information to the teacher, another aunt with whom she was living at the time took N.D. to the police station. She did not recall what happened after that.

Speaking of the time after she reported the matter, N.D. testified that her family did not believe her. And S told N.D. she had caused her children to be taken away.

**N.D.'s CAC Interview and Her Trial Testimony About the Interview**

At trial, N.D. testified she did not recall making a statement at CAC in July 2001. She did remember going into a room there with teddy bears in it, but she did not recall her statement or any conversation that took place. The prosecution played for the jury a video recording of N.D.'s statement at CAC and a transcript of the recording was distributed to the jurors.

During the interview, N.D. told the interviewer she was 10 years old and that she had finished the fourth grade. She acknowledged she had told her teacher that something had happened to her. N.D. stated she told her teacher about her uncle, defendant,[3] "who touched me places I didn't like." The last incident N.D. could recall occurred in January

---

[3] In the victims' statements at CAC, the victims identified defendant as Justo and Justo Fernandez. There is no dispute that, in doing so, they were referring to defendant. In recounting these statements, we replace references to Justo Fernandez by name with "defendant."

at her aunt's house in Stockton.  When the interviewer asked N.D. what happened, N.D. responded that she did not know because "normally he does it when I'm sleeping."  N.D. continued, "[s]o I really don't . . . what he did or anything but . . . sometimes I wake up and he (unintelligible) touched me in places I don't like."  N.D. stated that, when the incident occurred in January, she was in her Aunt S's room.  She stated that S was in the room at the time, but "he tried to sneak in when my aunt won't hear him 'cause she's a light sleeper."  N.D. was in her cousin's bed, and her cousin was sleeping with S.  N.D. woke up and defendant was pretending to be asleep on the floor.  N.D. stated she did not really know what woke her up, but she thought she may have had to go to the bathroom.  Ordinarily, defendant would sleep in his own room.  Asked if she had felt defendant touch her, N.D. responded, "Yeah a little."  She stated she felt defendant touch her on the chest under her T-shirt.  N.D. got up and went to the bathroom, and, when she returned, defendant had moved to the living room.  Nothing else happened on that occasion.

N.D. told the interviewer that the first incident she could remember occurred in a hallway when she was playing with her cousin.  N.D.'s cousin went to get something to drink and defendant "tried to start touching" her.  N.D. did not let defendant touch her, and "kept on trying to get away."  N.D. stated that defendant "tried to come near me and I tried running away but sometimes he catches me."  Defendant caught N.D. by her T-shirt and started trying to touch her over her clothes.  Nothing else happened on that occasion.

On another occasion, N.D. was in the kitchen of her aunt's house getting something out of the refrigerator when defendant, from behind her, tried to touch her between her legs.  N.D. stated that defendant "tried touching me but his daughter walked in.  And I also called her."  N.D. stated that defendant did not manage to touch her.

The interviewer asked N.D. how she knew defendant had touched her, apparently referring to N.D.'s accounts of defendant touching her when she was asleep.  N.D. responded that "[s]ometimes I feel it."  When the interviewer asked if she saw something, N.D. stated, "No.  (Unintelligible) feel is because I would have uh . . . uh feeling that I

6

have to go to the bathroom." N.D. continued: "But I don't. So I'll be like awake and I'll try to uh . . . when he . . . when I do feel it and I don't have to go to the bathroom I try to hurry up and like . . . make sure the blanket (unintelligible) stuff all under me and hum people stuff them under them self like if they don't want someone to get them or anything." She explained, she would put part of the blanket underneath her body and try to hold it down with her body so that defendant would not touch her.

N.D. stated that, when defendant touched her, he told her "not to tell or I'm not going to be able to go to his house anymore."

After the prosecution played the video recording for the jury, N.D. identified herself as the girl in the video, and stated that she was 10 years old at the time.

The prosecutor asked N.D. if there were things she did not disclose to the interviewer in 2001. N.D. responded: "There was the comment about the melon that I previously said that it was not said. I did refrain from telling at that time -- refrain from telling a lot of details because I did fear not seeing my aunts and my cousins. I cannot tell you a specific script of what I did and did not say to them. But I know that there's a feeling of regret after I even told the teacher because I didn't want to risk not seeing them again." N.D. further testified there were details she did not want to share with the interviewer because she feared "it would make matters worse and I would definitely not see my cousins."

On cross-examination, N.D. acknowledged she had not disclosed in the interview that defendant had exposed his penis to her. The first time she disclosed that incident was during an interview with law enforcement in 2014. N.D. did not talk to anyone about these events between July 2001 and December 2014. She acknowledged that she had no independent recollection of the CAC interview.

**Incident Involving Victim J.D.**

L.H., J.D.'s father, testified that he attended a church in Stockton on Wednesdays and Saturdays. He was a musician and played piano in a group at the church. On or

about October 11, 2014, L.H. went to the church and J.D. and his two sons came with him. L.H. played with his band and when he returned to where he had left his children, J.D. was not with her brothers. L.H. then found her crying in a corner. L.H. asked her what had happened, but J.D. cried, hugged L.H., and was trembling. J.D. then told L.H. that someone had "said for her to come with him because he was going to give her some chocolates." J.D. then told L.H. that something had happened to her. She was crying a lot and she did not want to tell L.H. what had happened. Initially she told L.H. that "he was going to give her the chocolate and to go with him," and that "it was in the restroom . . . ." According to L.H., eventually J.D. told him that the incident had not happened in the restroom, that it happened in the parking lot, and that "he hugged her and that he pushed her up against the car and he embraced her, and he did like sort of sexual movements on her." She initially told L.H. that the incident occurred in the restroom because she thought she would be in trouble with L.H. for going outside to the parking lot. Asked to describe the movements reported by J.D., L.H. testified that "it is a motion like to -- having sex, like a movement." Ultimately, J.D. told L.H. that it was defendant, who also attended the church, who had done these things to her. L.H. became very angry. He was going to call the police, but instead he called the pastor's wife. On cross-examination, L.H. testified he had seen defendant hand out candy to children before, and that defendant had given candy to J.D. before.

J.D. was 10 years old at the time of the trial. She testified she was in the fifth grade and had two brothers. She testified that, on a night in October 2014, she went to the church and something bad happened. Asked to describe what happened, J.D. testified: "right when we were inside then I went to go get a drink of water and then I saw -- the guy like was right there and then he told me if I wanted a candy so I'm like, um, yeah, but later on. He said come on, just for a little while. And then I'm like, um, my dad told me not to go outside. So I -- and then he's like no, come on, it's just for a little while, so that's why I went with him. And then like I was getting the candy, and

8

then like, um, I wanted to run away but I couldn't because like he was like about to rape me, but like I was scared so I couldn't move, and then I was about to run away and he was like he already done it like three times."

Initially, when asked whether the man was there in court, J.D. said she did not know, but she identified the man who did it as "Justo." Ultimately, she identified defendant in the courtroom as the person who did it to her.

Recounting the incident in more detail, J.D. testified that she went with defendant to his car. After she was given the candy, she "felt like he was going to do something." She wanted to run away, but she was scared and stayed still. Then defendant "did it three times," and it lasted for three to five seconds. J.D. testified that she felt defendant's private part near her private part. Defendant was "moving his private part around mine." He was hugging her when he had his private part on hers for five or six seconds, and then he let go. He "put his private part on mine, and I didn't like it. And that's why I was crying in church all the time and then my dad figured it out."

Afterward, defendant acted like nothing happened and went to buy batteries. After defendant left, J.D. went into the church, crying. J.D. talked to her father about what had happened, and she also talked to the pastor's wife. She explained to the jury that when she first told her father what had happened, she did not tell him that it happened outside by the car because he had told her not to go outside.

On cross-examination, J.D. acknowledged that defendant gave out candy to a lot of kids at church.

**J.D.'s CAC Interview**

The prosecution played a video recording for the jury of J.D.'s statement at CAC. A transcript of the recording, which is part of the record on appeal, was distributed to the jurors.

J.D. was nine years old when she was interviewed at CAC. The interviewer asked J.D. if she knew what she was there to discuss. J.D. responded: "Um, well one day when

9

we went to church I was over there using the restroom and then I went to go drink some water.  And then this man from church . . . he came and he said um, 'Do you want chocolate?'  And then I'm like uh yeah.  I thought he was going to bring it to me.  And he said come on I don't know my dad might get me in trouble.  And he's like, No.  And then I went.  Since I know.  And then I went over there and then I was kind of like . . . far away from the car like the car was right here and I was right here.  And then he told me to come in this place where it's all dark.  And I'm like ok to get my chocolate and then well so then he said, 'Give me a hug.'  And I gave him a hug but then he put me like against the car and then he put his private part with mine."  J.D. stated that she "was about to run but I couldn't."  She continued:  "Since he was coming really closer and closer.  So, so I couldn't run.  And then . . . well, when I was, when he, got separated close the door.  I came over here quickly.  And then um . . . and then he was like, 'You want another hug?', and I'm like 'No'.  And then he's like, 'Come on I'll give you chocolate'.  I'm like 'No'."  When the interviewer asked if she knew the man who did it, J.D. responded that it was "Justo.  El hermano Justo."

Asked to describe in more detail what the man did when he "put his private part with" hers, J.D. stated that he "put his tummy first and then he put hum his private part and then I felt it go like one and then two."  When she referred to the man's private part, she was referring to what her brother calls a "weenie."  When he did it, J.D. felt "something like a little pokey thing or something like that."  She felt it on her "private part."

J.D. stated that, after the incident, she went inside and started crying.  She then told her father what had happened.

**Stipulation**

The parties stipulated, among other things, that defendant "was convicted of . . . Section 261.5(d), a felony-unlawful sexual intercourse without force or fear with a minor 14 years old on January 25, 2011, in San Joaquin County, California."**4**

**Defense Evidence**

G.M. testified that she was the wife of the pastor at the church. She testified that defendant attended the church and helped around the church with "[e]verything," including cleaning and picking up trash.

G.M. testified that she spoke with J.D. after an incident with defendant occurred. J.D. told G.M. that defendant tried to touch her while she was trying to drink water. While J.D. was describing the incident, her father "was pushing her, 'Tell her, tell her.'" Defense counsel asked if G.M. told the police that "the little girl told [G.M.] that [defendant] hugged her," and if G.M. remembered being told that, and G.M. responded: "It was a long time ago. [¶] What can I say? The girl came out of the restroom to drink water. And that right there, [defendant] tried to hug her. But she was crying. And afterward she would say that he was touching her. She would give me several versions." She again testified that "[s]he said that he was trying to hug her."

G.M. testified that J.D. gave her two different versions of the events. However, she subsequently testified that it was J.D.'s father who gave the second version. According to G.M., when J.D. gave the first version, her father was near her, was angry, and was pushing J.D. to tell G.M. what had happened. When J.D.'s father gave the second version, he said the incident had not happened in the church, but instead that it

---

**4** The trial court had previously granted the prosecution's in limine motion, over defense counsel's objection, to admit the evidence of the prior sex offense pursuant to Evidence Code sections 1108 and 1101, subdivision (b). Defendant appropriately does not challenge that ruling on appeal.

11

had happened in the parking lot. On cross-examination by the prosecutor, G.M. acknowledged that the only difference between the two versions of the event as described to her was the location where the incident occurred.

G.M. testified that defendant carried bags of candy and gave it to everyone. According to G.M., defendant was very friendly. She never saw defendant hug or touch children, and she testified that children did not seem to be afraid of him. A.R., a member of the church, also testified that he had seen defendant give candy to everyone at the church.

Defendant testified that he regularly gave out candy to people at church. He said it was "just a habit of mine."

Defendant further testified that, on the evening of October 11, 2014, he was at church and someone asked him to go to the store to get batteries for the pastor's microphone. On his way out, defendant saw J.D. by the water fountain near the door. According to defendant, J.D. asked him, " 'Where is my chocolates?' " Defendant responded that they were in the car and that he was on his way out to get some batteries. When defendant went outside, he turned around and saw that J.D. was following him. She was saying that she wanted her chocolates. J.D. followed defendant toward his car. Defendant stopped at his car, retrieved chocolates from the car, and gave one to J.D. Defendant testified that J.D. raised her arms up to hug him, and he gave her a hug with one arm, with J.D.'s body to the side of his. He testified his private parts never touched J.D.'s private parts, he did not rub up against her and the hug last only one second. Thereafter, he walked to get the batteries.

Minutes later, defendant returned to the church, went inside, and sat down at the service. Approximately 20 minutes later, G.M. called defendant outside. J.D.'s father and a person defendant identified as Tonio were outside. Tonio told defendant that he wanted to talk to him about something serious that had happened. Defendant testified that Tonio told defendant he thought defendant "had put my private parts on the wall in

12

the bathroom." Asked what he told Tonio, defendant testified: " 'Didn't she come out to the parking lot? It wasn't over there on the wall.' " Tonio responded that J.D. had said defendant had tried to hug her in the bathroom. Defendant testified that he did not hug J.D. in the bathroom. He told Tonio that the only hugging he did was near his car.

Defendant testified he is four feet eleven inches tall. He further testified that in October 2014, J.D. was probably four to six inches shorter.

Regarding N.D., defendant testified that she used to stay at his house. He did not want her to stay at his house because "she would always kick me, she would jump on top of me, and I didn't like that." When N.D. would sleep at his house, defendant would sleep in the living room because "she said that I had touched her" and defendant did not want any problems. He testified that, when it was very hot or very cold, he would sleep in the bedroom, on the floor next to the door. There were also times when N.D. would be at the house when defendant would sleep with his wife in the bed. N.D. would sleep with one of his daughters. He testified he never touched N.D. inappropriately when he was sleeping in that room. He also never exposed his penis to N.D. wanting her to touch it, and he never talked to her about his penis. Defendant further testified that he never talked to N.D. "about what her vagina tasted like, like it was a piece of fruit."

### Verdict and Sentencing

The jury found defendant guilty on all four counts and found all four section 667.61, subdivision (e)(4), multiple victim enhancement allegations to be true. The trial court sentenced defendant to 15 years to life on each of the four counts, with the sentences to run consecutively.

13

## DISCUSSION

### I. The Admission of Statements Made by Victims
### Pursuant to Evidence Code Section 1360

### A. Additional Background

In his in limine motions, the prosecutor sought the admission, pursuant to Evidence Code section 1360, of J.D.'s and N.D.'s statements made in the CAC interviews. The prosecutor asserted that the statements satisfied the foundational requirements of Evidence Code section 1360. At the hearing, defense counsel noted that the statements could be admissible for impeachment purposes if the victims testified. He did not object to the admission of these statements. The trial court granted the prosecutor's request, and the video recordings of the victims' CAC interviews were played for the jury as set forth *ante*. However, before J.D.'s interview was played for the jury, defense counsel stated that "the whole thing's over our objection, Your Honor. I stated that earlier," apparently referring to some off-the-record discussion. No specific ground for the objection was stated on the record.

### B. Evidence Code Section 1360

Evidence Code section 1360, subdivision (a), provides that "In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 *describing any act of child abuse* or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule" if "three conditions are met: (1) the court finds that the time, content and circumstances of the statement provides sufficient indicia of reliability; (2) the child either testifies at the hearing or there is corroborating evidence of the hearsay statements; and (3) the proponent of the statement gives notice to the adverse party that it intends to use the statement at trial." (Evid. Code,

14

§ 1360, italics added; *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1329 (*Brodit*).)[5]

"We review a trial court's admission of evidence under [Evidence Code] section 1360 for abuse of discretion." (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367.)

### C. Defendant's Contentions

Defendant asserts that the trial court erred in permitting the prosecution to play the entirety of the video recordings of the victims' CAC interviews. He asserts that the video recordings and the transcripts should have been redacted so the jury would only be presented with those statements each victim made " 'describing acts of child abuse.' " Defendant asserts that Evidence Code section 1360 only provides for the admission of statements describing acts of child abuse and nothing more. He asserts that Evidence Code section 1360 "is not carte blanc [*sic*] to admit everything the alleged victim said outside of court about the defendant, the surrounding circumstances, his or her own motivations and reasons, nor the statements and questions of trained child abuse interviewers, which do not describe criminal acts of child abuse." Defendant

---

[5] In full, Evidence Code section 1360 provides: "(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 *describing any act of child abuse* or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child either: [¶] (A) Testifies at the proceedings. [¶] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child. [¶] (b) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement. [¶] (c) For purposes of this section, 'child abuse' means an act proscribed by Section 273a, 273d, or 288.5 of the Penal Code, or any of the acts described in Section 11165.1 of the Penal Code, and 'child neglect' means any of the acts described in Section 11165.2 of the Penal Code." (Italics added.)

acknowledges that the CAC interview video recordings here do contain statements describing acts of child abuse. However, he further asserts that the trial court did not limit the evidence admitted to those statements describing acts of child abuse. He asserts that "most" of the victims' statements in the video recordings were not statements describing acts of child abuse. According to defendant, by admitting the entirety of the interviews, "extensive evidence of many details about the victims, the defendant and the circumstances of which were not statements describing child abuse, but which tended to corroborate the in-court testimony" was put before the jury. According to defendant, the video recordings should have been redacted so that only statements describing acts of child abuse would have been admitted, which is all that is authorized by Evidence Code section 1360.

### D. Forfeiture

Defendant has forfeited his contention as to both CAC interviews by not making specific objections to the evidence in the trial court. Evidence Code section 353 requires that an objecting party "make clear the specific ground of the objection or motion." And based on Evidence Code section 353 our high court has explained: "[A] trial objection must fairly state the specific reason or reasons the defendant believes the evidence should be excluded. If the trial court overrules the objection, the defendant may argue on appeal that the court should have excluded the evidence for a reason asserted at trial. *A defendant may not argue on appeal that the court should have excluded the evidence for a reason not asserted at trial.*" (*People v. Partida* (2005) 37 Cal.4th 428, 431, some italics added.) Moreover, the objecting party cannot simply make a " 'placeholder' objection" on general grounds. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 22.) "The objection must be specific enough as to 'fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' " (*People v. Lucas* (2014)

16

60 Cal.4th 153, 264-265 [objection made at trial to photograph of a document was insufficient to preserve contention that the photograph was admitted in violation of the "best evidence" rule because that specific objection was not made].)

Defendant made no objection whatsoever to the admission of N.D.'s CAC interview. And defendant did not object to J.D.'s statement on the grounds asserted on appeal. Indeed, defendant's objection –"the whole thing's over our objection Your Honor" – lacked any specificity whatsoever. Defense counsel's statement indicating "I stated *that* earlier" did not preserve the issue for appeal. (Italics added.) First, that an objection was registered earlier is not in the record. Second, for this reason the "that" to which defense counsel referred is unclear. Did counsel simply make a generic, unspecified objection? Or did counsel state specific grounds, and if so, what were those grounds? We do not know, because whatever was said is not in the record.

The purpose of Evidence Code section 353 is to provide the trial court an opportunity to make an informed decision to avoid prejudice (*People v. Davis* (2008) 168 Cal.App.4th 617, 627), and give the proponent of the evidence the opportunity to cure the defect or take other steps designed to minimize the prospect of reversal (*People v. Morris* (1991) 53 Cal.3d 152, 187-188; *People v. Chaney* (2007) 148 Cal.App.4th 772, 779-780).[6] Moreover, without a specific objection, a reviewing court is unable to properly review the admissibility of the evidence on appeal.

Realizing his dilemma, defendant asserts in his reply brief that defense counsel provided constitutionally ineffective assistance of counsel by failing to object in the trial

[6] The People argue that the doctrine of invited error bars consideration of defendant's contention on appeal regarding J.D.'s statement because defendant sought to introduce her interview to attack her credibility regarding the inconsistency related to the location where the molestation had taken place. But the People's argument is inconsistent with the record. Although it is unclear what grounds defendant had in mind for objecting to J.D.'s CAC statement, the record is clear that defendant did register an objection before it was introduced. The invited error doctrine does not apply here.

17

court.  Ordinarily we would not consider new points raised in the reply brief, but to forestall future claims of ineffective assistance of appellate counsel for failing to make the claim in the opening brief, we shall address the belated claim of ineffective assistance of trial counsel on this issue.

### E.  Ineffective Assistance of Counsel

### 1.  General Principles Related to Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367 (*Rogers*).)  " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)  The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.  [Citation.]  . . .  It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' " (*Richter*, at p. 105.)

### 2.  Analysis

#### a.  Deficient Performance

Trial counsel was not constitutionally deficient if the grounds upon which defendant relies on appeal for precluding portions of the victims' statements is meritless. (*People v. Ochoa* (1998) 19 Cal.4th 353, 463 (*Ochoa*) [counsel is not constitutionally

18

ineffective for failing to raise a meritless objection]; *People v. Pierce* (2015) 234 Cal.App.4th 1334, 1337 (*Pierce*) [same].)

Defendant does not dispute the foundational requirements of Evidence Code section 1360 were satisfied as to statements describing acts of child abuse. He only asserts that portions of the recordings containing statements which did not describe acts of child abuse should not have been admitted because the admission of such statements are not authorized by the statute.

It is not completely clear, however, what specific portions of the interviews defendant claims should have been redacted. He has not identified any specific portions for us to consider. He merely asserts that Evidence Code section 1360 does not permit introduction about "everything the alleged victim said outside of court about the defendant, the surrounding circumstances, his or her own motivations and reasons, nor the statements and questions of trained child abuse interviewers, which do not describe criminal acts of child abuse." This would seem to include portions of the interviews where the interviewer explained the interview process to the victims, tried to put them at ease, and attempted to establish a rapport with the victims. It might also include N.D.'s explanation of the circumstances under which she disclosed the acts of abuse and other portions of the interviews. We will not attempt to guess at what specific segments of the interviews defendant thinks should have been redacted. Instead, we will address defendant's contentions in the context of the more general assertions he has made.

We reject defendant's myopic interpretation of Evidence Code section 1360's language identifying as admissible any statements "describing any act of child abuse." (Evid. Code, § 1360, subd. (a).) As we have previously observed, in interpreting a statute, " 'Our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose

19

and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.' "  (*People v. Fandinola* (2013) 221 Cal.App.4th 1415, 1421-1422, quoting *San Leandro Teachers Assoc. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822, 831 & *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

We look first to the statutory context involving other provisions within Evidence Code section 1360 and the Evidence Code generally.  Under subdivision (a)(1)-(3) of Evidence Code section 1360, certain circumstances must exist before the statements are admissible.  (See fn. 5, *ante*.)  Subdivision (a)(2) of Evidence Code section 1360 addresses circumstances relevant to the reliability of the statements.  To be admissible, the court must find "that the time, content and circumstances of the statement provides sufficient indicia of reliability." (*Brodit, supra*, 61 Cal.App.4th at p. 1329.)  These are all circumstances that would be relevant to the credibility of a hearsay declarant for the jury's determination (see Evid. Code, § 210 [relevant evidence includes evidence relevant to the credibility of a hearsay declarant]), and relevant to the weight the jury should give such hearsay.  So, for example, portions of the statement where the interviewer explained the interview process to the victims, tried to put them at ease, and attempted to establish a rapport with the victims would be pertinent to the reliability and weight the jury could afford to the hearsay.  So too would be the victim's explanation of how she first disclosed the molestations.  In our view, defendant's suggestion that such portions of the interview must be redacted would result in an absurd consequence the Legislature could not have intended.

Defendant's apparent claim that statements concerning the surrounding circumstances should not be admissible under Evidence Code section 1360 would also result in absurd results.  Defendant would apparently preclude any part of the statement concerning where and when the acts of abuse the victim described took place, the

victim's knowledge or relationship with the perpetrator, and how it was that the perpetrator facilitated the molestation, for example, offering the victim candy. Defendant's interpretation on this point is untenable.

In addition, where the Evidence Code section 1360 statements are video-recorded, as they were here, a trial court could reasonably conclude that allowing the jury to view the complete interviews was relevant to the veracity of the victims' disclosures because it allowed the jury to observe the hearsay declarant's demeanor, developmental level, and the interaction between the victims and their interviewers. (See Evid. Code, § 210 [evidence pertaining to the credibility of a hearsay declarant is relevant]; *People v. Yor Xiong* (2020) 54 Cal.App.5th 1046, 1074 [noting that the jurors were able to view and scrutinize the video recording of an interrogation and, from that, evaluate defendant's credibility during the interrogation].)

We do not agree with defendant to the extent that he would limit Evidence Code section 1360 evidence literally to only those statements in which a victim describes the discrete acts of child abuse, devoid of any context or narrative. Defendant has cited no case to support his contention, nor any analysis from a case that would advance his argument.

Defendant singularly relies upon *People v. Hefner* (1981) 127 Cal.App.3d 88 (*Hefner*), in which the Court of Appeal concluded that the trial court erred in admitting, on its own motion, for the truth of the matter asserted, the preliminary hearing and first trial testimony of one of the victims at a subsequent trial. (*Id*. at p. 97.) On defendant's appeal, the People asserted that the statements were admissible under Evidence Code section 1237, the hearsay exception for past recollection recorded. (*Hefner*, at p. 97.) The *Hefner* court stated: "[T]he necessary foundation for admitting prior testimony under Evidence Code section 1237, subdivision (a), was not laid as to all of the matters to which [the victim] testified in the first two proceedings. At most, it would have been proper to admit prior testimony under Evidence Code section 1237, subdivision (a), as to

21

those matters which [the victim] testified she could not remember clearly.  By admitting the previous testimony in its entirety for the truth of the matters stated, the trial court went well beyond this.  For example, [the victim's] testimony at the last trial contained reference to only one instance of oral copulation upon her, and she did not express any inability to recollect how many times Hefner had performed this act on her.  However, her preliminary hearing testimony, while somewhat confusing, is susceptible to the interpretation that Hefner, in fact, orally copulated her two different times.  The potential prejudicial effect of this error is compounded by the failure to give [the unanimity instruction]. . . ."  (*Hefner*, at p. 97.)

Obviously, *Hefner* is not an Evidence Code section 1360 case.  Moreover, we agree with the People that, here, the foundational requirements for admission of the CAC statements pursuant to Evidence Code section 1360 were satisfied.  Because we disagree with defendant concerning the interpretation of Evidence Code section 1360 and the admission of the entire CAC interview statements under that section, the admission of certain statements in those interviews that did not strictly describe an act of child abuse does not undermine the fact that the prosecution made the requisite foundational showing.

We conclude that defendant's proffered interpretation of Evidence Code section 1360 is neither mandated by the plain language of that section nor what the Legislature intended.  Defense counsel was not deficient for failing to object on the grounds defendant now asserts on appeal.

### b.  Prejudice

Even if it was error to allow the unspecified portions of the interviews and trial counsel should have made specific objections as required by Evidence Code section 353, we conclude defendant has failed to show prejudice.

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' "  (*Richter, supra*, 562 U.S. at

22

p. 104.)  Rather, defendant must show a reasonable probability he would have received a more favorable result had counsel's performance not been deficient.  (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.)  "*The likelihood of a different result must be substantial*, not just conceivable." (*Richter*, at p. 112, italics added; *Rogers, supra*, 245 Cal.App.4th at p. 1367; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75 (*Jacobs*); *In re M.P.* (2013) 217 Cal.App.4th 441, 457, fn. 10 (*M.P.*).)

Both victims testified at trial consistently with their interview statements, although N.D. offered additional details not furnished in her interview.  We consider the evidence against defendant independent of the CAC interviews to be overwhelming.  That evidence included:  the victims' trial testimony; the portions of the CAC interview statements to which defendant does not raise any objection; L.H.'s testimony describing J.D. reporting to him the incident she had with defendant; and defendant's prior conviction for section 261.5 admitted under Evidence Code section 1108, showing that he has a propensity for sexual conduct with underage persons.  We also note the lack of credible evidence showing a motive why the two victims, independent of each other, would accuse defendant of sexual molestations approximately 15 years apart.[7]  We conclude it is not reasonably probable that the result at trial would have been more

---

[7]  Defendant's trial testimony as to potential motives for the victims to fabricate lacked credibility.  He testified that L.H., J.D.'s father might have been mad at him because he refused to loan his truck or because L.H. was jealous because defendant told him he had papers and was going to Mexico.  Defendant testified that N.D.'s mother used drugs and made N.D. accuse him of the molestations.  But he gave no explanation why N.D.'s mother would have it out for him.  Defendant also testified that N.D. accused him of the molestations to cause him and his wife to separate.  According to defendant, N.D. said defendant was not good enough for her aunt.  But according to defendant's own testimony, he and his wife stopped living together in 2006, long before N.D.'s 2014 police interview and trial testimony.

favorable to defendant had the portions of the CAC interviews about which he generically complains on appeal been redacted. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-221.)

In asserting that the purported error was prejudicial, defendant contends that the victims' CAC interview statements served to corroborate their own trial testimony with matters other than "acts of child abuse." He emphasizes that the prosecution made use of such corroboration in his closing argument. As noted by defendant, the prosecutor argued in closing: "And you saw those witnesses come in here and testify. And she said, 'Well, yeah, she changed her story. She changed her story in one detail where it happened.' Why? Because she was worried that her dad would be mad that she went out with him in the parking lot. And she freely admitted that. She admitted that that night. She admitted it on the stand. *And she admitted it at the CAC*. That's why that one detail changed. [¶] *Compare what she said on the stand with what she said at the CAC*. *Remarkably similar*. Remarkable memory that she has for a ten-year-old." (Italics added.)

Assuming that a statement about where a molestation took place is not part of a description about an act of child abuse within the meaning of Evidence Code section 1360, the prosecutor's closing argument that J.D.'s trial testimony was consistent with her CAC interview statements and the fact that certain CAC statements which did not describe acts of child abuse could be deemed to have corroborated trial testimony does not establish that defendant was prejudiced by the introduction of the entirety of the CAC statements into evidence. Indeed, once defendant sought to impeach J.D. with the inconsistency, and J.D. responded by giving her explanation to the jury, the prosecution

would have been permitted to introduce the prior consistent statement under Evidence Code section 791, the hearsay exception for prior consistent statements.[8]

Defendant's contention that the alleged error was prejudicial because the victims "were permitted to tell the jury their whole stories twice, once without being cross examined" is also without merit. The victims were subject to complete cross-examination by defense counsel on any relevant subject, including their CAC statements. And the basis of defendant's substantive contention would not preclude presentation of the most damaging aspects of the victims' CAC statements: those statements describing acts of child abuse committed by defendant.

We conclude that, in view of the other evidence, if defendant's trial attorney sought and successfully obtained redaction of the victims' CAC statements, there is no reasonable probability the jury would have reached a more favorable outcome. (*Strickland*, *supra*, 466 U.S. at p. 694; *Ledesma*, *supra*, 43 Cal.3d at p. 218.) Not only is the likelihood of a different result insubstantial, it is inconceivable on these facts. (See *Richter, supra*, 562 U.S. at p. 112; *Rogers, supra*, 245 Cal.App.4th at p. 1367; *Jacobs, supra,* 220 Cal.App.4th at p. 75; *M.P., supra*, 217 Cal.App.4th at p. 457, fn. 10.)[9]

---

[8] Evidence Code section 791 provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

[9] Defendant also makes a bald assertion that the purported evidentiary error deprived him of a fair trial. " 'One asserting prejudice has the burden of proving it; a bald assertion of prejudice is not sufficient.' " (*People v. Sandoval* (1992) 4 Cal.4th 155, 174, quoting *People v. Johnson* (1988) 47 Cal.3d 576, 591.) Defendant has failed to show that the admission of the entire CAC interviews deprived him of a fair trial.

## II. Ex Post Facto Application of Section 667.61

### A. Ex Post Facto Principles, Section 667.61, and Section 1203.066

Ex post facto principles bar laws which (1) make criminal an act that was innocent when committed, (2) make a crime greater than it was when committed, (3) make the punishment greater than it was when the act was committed, and (4) alter the legal rules of evidence by allowing for " 'less or different testimony than the law required at the time of the commission of the offense in order to convict the offender.' " (*Carmell v. Texas* (2000) 529 U.S. 513, 522, 525 [146 L.Ed.2d 577].)  California's constitutional bar on ex post facto laws is analyzed in the same manner as the federal constitutional bar.  (U.S. Const., art. I, § 10, clause 1; Cal. Const., art. I, § 9; *People v. Alford* (2007) 42 Cal.4th 749, 755.)  The People acknowledge on appeal that reliance on the version of section 667.61, also known as the "One Strike Law," as amended after defendant committed the offenses in counts 2, 3, and 4 concerning N.D. would violate ex post facto principles.

Under section 667.61 in effect at the time of sentencing, with exceptions not relevant here, "any person who is convicted of an offense specified in subdivision (c) [of section 667.61] under one of the circumstances specified in subdivision (e) [of that section] shall be punished by imprisonment in the state prison for 15 years to life."  (§ 667.61, subd. (b).)  Among the offenses in subdivision (c) of section 667.61 is "Lewd or lascivious act, in violation of subdivision (a) of Section 288."  (§ 667.61, subd. (c)(8).)  Among the circumstances specified in subdivision (e) of section 667.61 is where "[t]he defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim."  (§ 667.61, subd. (e)(4).)

However, the former version of section 667.61, in effect in 2000 and 2001, at the time of defendant's offenses against N.D., allowed for an exception to life sentences for lewd or lascivious acts, in violation of subdivision (a) of Section 288 as referenced in subdivision (c) of section 667.61.  At the time, that provision read:  "[a] violation of subdivision (a) of Section 288, *unless the defendant qualifies for probation under*

*subdivision (c) of Section 1203.066.*" (§ 667.61, former subd. (c)(7), italics added.) And at that time, section 1203.066 concerning probation eligibility prohibited probation when specified aggravating factors were present, including: "A person who is convicted of committing a violation of Section 288 or 288.5 against more than one victim." (§ 1203.066, former subd. (a)(7).)[10] But subdivision (c) of section 1203.066 in effect at the time set forth several circumstances, for which the court was required to make findings, to avoid the multiple victim prohibition on probation. Among those was

---

[10] In full, former section 1203.066, subdivision (a), prohibiting probation provided: "(a) Notwithstanding Section 1203 or any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, nor shall a finding bringing the defendant within the provisions of this section be stricken pursuant to Section 1385 for, any of the following persons: [¶] (1) A person who is convicted of violating Section 288 or 288.5 when the act is committed by the use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person. [¶] (2) A person who caused bodily injury on the child victim in committing a violation of Section 288 or 288.5. [¶] (3) A person who is convicted of a violation of Section 288 or 288.5 and who was a stranger to the child victim or befriended the child victim for the purpose of committing an act in violation of Section 288 or 288.5, unless the defendant honestly and reasonably believed the victim was 14 years of age or older. [¶] (4) A person who used a weapon during the commission of a violation of Section 288 or 288.5. [¶] (5) A person who is convicted of committing a violation of Section 288 or 288.5 and who has been previously convicted of a violation of Section 261, 262, 264.1, 266, 266c, 267, 285, 286, 287, 288, 288.5, 288a, or 289, or of assaulting another person with intent to commit a crime specified in this paragraph in violation of Section 220, or who has been previously convicted in another state of an offense which, if committed or attempted in this state, would constitute an offense enumerated in this paragraph. [¶] (6) A person who violated Section 288 or 288.5 while kidnapping the child victim in violation of Section 207, 209, or 209.5. [¶] (7) *A person who is convicted of committing a violation of Section 288 or 288.5 against more than one victim.* [¶] (8) A person who, in violating Section 288 or 288.5, has substantial sexual conduct with a victim who is under 14 years of age. [¶] (9) A person who, in violating Section 288 or 288.5, used obscene matter, as defined in Section 311, or matter, as defined in Section 311, depicting sexual conduct, as defined in Section 311.3." (Italics added.)

27

subdivision (c)(2): "A grant of probation to the defendant is in the best interest of the *child*."**11** (Italics added.)

## B. Defendant's Contentions

On counts 2, 3, and 4, concerning the offenses committed against N.D. in 2000 and 2001, the trial court sentenced defendant to consecutive terms of 15 years to life. Defendant asserts that the imposition of life sentences for those offenses constitutes an improper ex post facto application of section 667.61, because under the version of section 667.61 in effect at the time, a conviction under subdivision (a) of section 288 only

---

**11** In full, former section 1203.066, subdivision (c) provided: "Paragraphs (7), (8), and (9) of subdivision (a) shall not apply *when the court makes all of the following findings*: [¶] (1) The defendant is the victim's natural parent, adoptive parent, stepparent, relative, or is a member of the victim's household who has lived in the victim's household. [¶] (2) *A grant of probation to the defendant is in the best interest of the child.* [¶] (3) Rehabilitation of the defendant is feasible, the defendant is amenable to undergoing treatment, and the defendant is placed in a recognized treatment program designed to deal with child molestation immediately after the grant of probation or the suspension of execution or imposition of sentence. [¶] (4) The defendant is removed from the household of the victim until the court determines that the best interests of the victim would be served by returning the defendant to the household of the victim. While removed from the household, the court shall prohibit contact by the defendant with the victim, except the court may permit the supervised contact, upon the request of the director of the court ordered supervised treatment program, and with the agreement of the victim and the victim's parent or legal guardian, other than the defendant. As used in this paragraph, 'contact with the victim' includes all physical contact, being in the presence of the victim, communication by any means, any communication by a third party acting on behalf of the defendant, and any gifts. [¶] (5) There is no threat of physical harm to the child victim if probation is granted. The court upon making its findings pursuant to this subdivision is not precluded from sentencing the defendant to jail or prison, but retains the discretion not to do so. The court shall state its reasons on the record for whatever sentence it imposes on the defendant. [¶] The court shall order the psychiatrist or psychologist who is appointed pursuant to Section 288.1 to include a consideration of the factors specified in paragraphs (2), (3), and (4) in making his or her report to the court." (§ 1203.066, former subd. (c), italics added.) As the italicized language indicates, the court must make "all" of the required findings, including that a grant of probation is in the "best interest of *the child*" before it could grant probation. (*Ibid.*, italics added.)

qualified for sentencing under section 667.61 if the defendant did not qualify for probation. He asserts that he did qualify for probation. He argues that, under the version of section 1203.066, subdivision (a), in effect at the time, he was not ineligible for probation because none of the aggravating factors set forth in that subdivision were involved in his offenses committed against N.D. Furthermore, defendant asserts that, because he was a relative of N.D.'s, under subdivision (c)(1) of section 1203.066 (see fn. 11, *ante*), he would have been eligible for probation, and, thus, the sentencing provision of section 667.61 would not have applied for this reason as well.

Defendant asserts that the application of the law to him as amended in 2006, which made all violations of section 288, subdivision (a), a qualifying offense for a life sentence under section 667.61, without regard to probation eligibility, violates the ex post facto provisions of the state and federal Constitutions. Under ex post facto principles, defendant asserts that he could not lawfully be charged or sentenced for offenses committed in 2000 and 2001 under the current provisions of section 667.61. Thus, defendant asserts that the sentence imposed on counts 2, 3, and 4 were unauthorized. Furthermore, defendant asserts that, because these counts do not qualify for treatment under section 667.61, his conviction under count 1 does not implicate the multiple conviction of qualifying crimes factor under section 667.61, subdivision (e)(4), and therefore he could not properly be sentenced to 15 years to life on count 1 either.

### C. Forfeiture

The People assert that, because defendant failed to request probation and present proof that he met the criteria for probation in the trial court, defendant has forfeited his contentions. Defendant responds that forfeiture does not apply where a trial court imposes an unauthorized sentence. He also asserts he cannot be deemed to have waived the issue for failing to present evidence to establish probation eligibility where the trial court was unaware of its discretion to sentence him to probation under the statutes in effect at the relevant time. As we explain, the sentence was not unauthorized.

29

The " 'unauthorized sentence' concept constitutes a narrow exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal."  (*People v. Scott* (1994) 9 Cal.4th 331, 354 (*Scott*).)  "Although the cases are varied, *a sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case*.  Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing.  [Citation.]  . . . [L]egal error resulting in an unauthorized sentence commonly occurs where the court violates mandatory provisions governing the length of confinement.  It does not follow, however, that nonwaivable error is involved whenever a prison sentence is challenged on appeal."  (*Ibid*., fn. omitted, italics added.)  "In essence, claims deemed waived on appeal involve sentences which, though otherwise permitted by law, were imposed in a procedurally or factually flawed manner."  (*Ibid*.)

The sentence imposed here *could* lawfully be imposed, even under the law existing at the time of defendant's offenses against N.D. in 2000 and 2001.  Defendant's assertion is that he qualified for probation relative to counts 2, 3, and 4, and the trial court sentenced him without being aware that it had the discretion to sentence him to probation.  Whether defendant qualified for probation is a factual determination that would have been made had defendant's trial counsel requested a grant of probation and presented evidence to establish defendant eligible for and worthy of probation.  Defendant's contentions amount to a claim that the sentences, "though otherwise permitted by law, were imposed in a procedurally or factually flawed manner."  (*Scott, supra*, 9 Cal.4th at p. 354.)  Thus, his claim does not establish an unauthorized sentence.

Rather than being a burden on the prosecution to disprove eligibility for probation, any eligibility for probation here must be shown by defendant.  (*People v. Woodward* (2011) 196 Cal.App.4th 1143, 1152 (*Woodward*).)  It is defendant's burden to present

evidence showing that he is entitled to consideration for probation under subdivision (c) of section 1203.066. (*Woodward*, at p. 1152.)

Defendant acknowledges *Woodward* and similar cases. However, he asserts that, where the trial court is unaware of its discretion to sentence the defendant to probation, remand for resentencing is required because the court, unaware of its discretion, could not have exercised "informed discretion" in sentencing. We disagree. Because it was defendant's burden to show that he was entitled to consideration for probation under section 1203.066 (*Woodward, supra*, 196 Cal.App.4th at p. 1152), we conclude that, by failing to request a grant of probation in the trial court, and submit evidence in support of that request, the trial court was under no obligation to consider probation and, moreover, defendant forfeited these contentions on appeal.

### D. Ineffective Assistance of Counsel

Defendant asserts that if, by failing to present evidence that he was eligible for probation, he forfeited or waived the issue, the forfeiture or waiver resulted from the constitutionally ineffective assistance of counsel. We conclude defendant has failed to show deficient performance because even if defense counsel would have requested the court to grant probation, he could not have presented facts sufficient to satisfy all of the circumstances required to grant probation -- specifically defendant could not have established that probation was in the best interest of *the child*.

As stated *ante*, the version of section 667.61 in effect in 2000 and 2001, at the time of defendant's offenses against N.D., included among the offenses specified in subdivision (c), "[a] violation of subdivision (a) of Section 288, *unless the defendant qualifies for probation under subdivision (c) of Section 1203.066*." (§ 667.61, former subd. (c)(7), italics added.)

Defendant's contention that he was eligible for probation under section 1203.066, former subdivision (a), because none of the aggravating factors set forth therein applied to the circumstances of his offenses is without merit. However, the issue is whether

31

defendant is eligible for probation "under subdivision (c) of Section 1203.066." (§ 667.61, former subd. (c)(7).) As noted, one of the circumstances required to grant probation is: "A grant of probation to the defendant is in the best interest of *the child*." (§ 1203.066, former subd. (c)(2), italics added.)

In *People v. Wills* (2008) 160 Cal.App.4th 728 (*Wills*), the Court of Appeal held that, under section 1203.066, former subdivision (c), a sentencing court has no authority to grant probation to a defendant when the molestation victim is no longer a child at the time of sentencing. (*Wills*, at p. 732.) The *Wills* court reasoned: "[l]ogically, where, as here, the victim is no longer a child at time of sentencing, the sentencing court is unable to make a finding under section 1203.066(c)(2) that '[a] grant of probation . . . is in the best interest of the child' for the simple reason that there is no child. In such a case, the sentencing court is unable to make 'all' of the findings specified in former subdivision (c) of section 1203.066, as required by that subdivision, and thus is not authorized to grant probation to a defendant . . . ." (*Wills*, at pp. 737-738.)

Defendant asserts that the *Wills* decision "is short-sighted and wrongly decided," urging us to decline to follow it. Defendant relies primarily on *People v. Jeffers* (1987) 43 Cal.3d 984. However, in *Wills*, the defendant also relied on *Jeffers*, and the *Wills* court discussed that case at length. (*Wills, supra*, 160 Cal.App.4th at pp. 738-739.) While we need not reproduce that analysis here, we note the *Wills* court concluded: "*Jeffers* is distinguishable in that it involved the household-member status factor set forth in former section 1203.066, subdivision (c)(1), not the 'best interest of the child' factor set forth in section 1203.066(c)(2), and the reasoning expressed in *Jeffers* with respect to the interpretation of the former does not apply here." (*Wills*, at p. 739.) The court also noted that the legislative concerns underlying the best interest of the child consideration noted by the *Jeffers* court—problems of financial and emotional dependency and self-blame by the victim for breaking up the family—relate to conditions "existing at the time of the sentencing." Because the victim is no longer a child, these legislative

32

considerations are no longer in play. (*Ibid.*) We disagree with defendant's criticism of *Wills* and adhere to the reasoning of that case here.

At the time of sentencing, N.D. was an adult. Therefore, the court could not have concluded under former subdivision (c)(2) of section 1203.066 that probation was in the "best interest of the child." (*Wills, supra*, 160 Cal.App.4th at pp. 732, 737-738.) Thus, regardless of any of the other required elements in former subdivision (c) of section 1203.066 that defendant bore the burden of establishing to demonstrate eligibility for probation (*Woodward, supra*, 196 Cal.App.4th at p. 1152), under *Wills*, defendant could not satisfy "all" of the requirements of former subdivision (c) of section 1203.066. Therefore, the trial court could not have found defendant eligible for probation under former subdivision (c) of section 1203.066 as to counts 2, 3, and 4, and, as a result, the probation eligibility exception in section 667.61, former subdivision (c)(7), would not apply. Defense counsel was therefore not deficient for failing to request probation and present evidence to justify the grant because such an effort would have been meritless. (*Ochoa*, *supra*, 19 Cal.4th at p. 463; *Pierce*, *supra*, 234 Cal.App.4th at p. 1337.) Moreover, in light of this, defendant suffered no prejudice; there is no likelihood, let alone a substantial likelihood, that had defendant's attorney raised the former versions of the sentencing statutes and the possibility of probation eligibility and presented evidence relevant to that determination, defendant would have achieved a more favorable result. (*Richter, supra*, 562 U.S. at p. 112.)[12]

---

[12] Moreover, even if we were to conclude that defendant could raise the issue for the first time on appeal simply because it appears the trial court was unaware of its sentencing discretion (see part III.C. of the Discussion, *post*), for all of the same reasons discussed *ante*, defendant's contentions fail on the merits and thus, any error was harmless.

33

### III. Resentencing for Consideration of Concurrent Sentencing

#### A. Additional Background

The probation report did not refer to the One Strike Law or consecutive or concurrent sentencing. As we shall discuss, the former law allowed for concurrent sentencing, and that it did was apparently not on the radar screen of the parties or the trial court.

At sentencing, defense counsel stated, in part, "*[i]f the Court had the discretion*, we would request that at least some of these counts be run concurrently. The Court is familiar with the facts of this case, and granted he was found guilty on four separate counts, two victims, but the overall nature of the conduct I think the Court could be, *if it had discretion*, might go with the sentencing more like 30 to life, rather than 60 to life. My client is 46 years old. And 30-to-life sentence would enable him to at least be eligible again for probation by the time he was 76, rather than 60[-to-life], which means he basically has a life sentence with no way out." (Italics added.)

The prosecutor stated that, "pursuant to . . . section 667.61(i), for any offense specified Paragraphs one through seven which would include the 288(A), the Court must impose consecutive sentence for each crime that resulted in conviction under the section, if it involves separate victims or involves same victims on separate occasion. [¶] So based on the, the language in the charging document for which he was convicted, we have four counts involving two separate victims, and all of the crimes occurred on different occasions. So, therefore, he's required to be sentenced to 60 years to life in state prison."

In sentencing defendant, the trial court stated that it considered the probation report, letters submitted on behalf of defendant, and a letter from the father of one of the victims. The trial court also stated it had considered, pursuant to California Rules of Court, rule 4.421, the circumstances in aggravation that the victims were particularly vulnerable, and that defendant took advantage of a position of trust or confidence to

34

commit the offenses. (Cal. Rules of Court, rule 4.421(a)(3), (11).) The court mentioned defendant's prior sex offense conviction and his prior prison term. The court sentenced defendant to 15 years to life on each of the four counts, with the sentences to run consecutively. The trial court did not expressly acknowledge its discretion to sentence defendant to concurrent or consecutive sentences or expressly state a reason for imposing consecutive sentences.

## B. Defendant's Contentions

Defendant asserts that the matter must be remanded and he must be resentenced so that the sentencing court can consider concurrent sentences and probation. Defendant asserts that he cannot be lawfully sentenced under section 667.61, and therefore he is entitled to consideration for concurrent sentencing. Reprising the argument we have rejected, he further asserts that, because he is not subject to sentencing under section 667.61, he is not rendered ineligible for probation under that section. He further asserts that he is not rendered ineligible for probation under the current version of section 1203.066.

## C. Analysis

As the People assert, and as we have determined, defendant was not improperly sentenced pursuant to sections 667.61 and 1203.066. Because defendant was not eligible for probation under former subdivision (c) of section 1203.066, and because defendant was convicted in the present case of committing violations of section 288, subdivision (a), against more than one victim (§ 667.61, subd. (e)(4); § 667.61, former subd. (e)(5)), defendant was not improperly sentenced to life terms pursuant to section 667.61 on counts 2, 3, and 4.

However, the People concede the matter should be remanded for resentencing on counts 2, 3, and 4 so that the sentencing court can exercise its discretion to consider whether to impose concurrent or consecutive sentences. The People correctly acknowledge that, under the version of section 667.61 in effect at the time defendant

committed his offenses against N.D. in 2000 and 2001, section 667.61 did not mandate consecutive sentences. (See Stats. 2006, ch. 337, § 33, adding subdivision (i) to section 667.61 mandating for the first time consecutive sentences under particular circumstances.) And " '[a]bsent an express statutory provision to the contrary, section 669 provides that a trial court shall impose either concurrent or consecutive terms for multiple convictions.' " (*People v. Woodworth* (2016) 245 Cal.App.4th 1473, 1479 (*Woodworth*), quoting *People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1262.)

" 'Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing. [Citations.] Defendants are entitled to "sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court," and a court that is unaware of its discretionary authority cannot exercise its informed discretion.' " (*Woodworth, supra*, 245 Cal.App.4th at p. 1480.) Additionally, "[t]he trial court must 'state the reasons for its sentence choices on the record at the time of sentencing.' [Citation.] Where the court has discretion, the imposition of a consecutive, rather than concurrent, term represents a sentencing choice." (*People v. Coelho* (2001) 89 Cal.App.4th 861, 886 (*Coelho*); Cal. Rules of Court, rule 4.406.)

The People concede that it does not appear clear on this record whether the sentencing court was aware of its discretion to impose concurrent sentences. As noted, the probation report did not mention the One Strike Law or concurrent sentences. Defense counsel urged the court that, *if it had discretion*, the court should run at least some sentences concurrently. The prosecutor erroneously stated that the court *must* impose consecutive sentences. In sentencing defendant, the trial court did not refer to any discretion to impose concurrent sentences and imposed consecutive sentences without stating reasons for that sentencing choice.

We must remand for resentencing on counts 2, 3, and 4 unless we can say that "doing so would be an idle act that exalts form over substance because it is not reasonably probable the court would impose a different sentence." (*Coelho, supra*, 89 Cal.App.4th at p. 889.) On this record, we cannot conclude that remanding for resentencing so that the trial court can knowingly exercise its discretion in choosing to impose concurrent or consecutive sentences as to each count would be an idle act. Therefore, we will remand for resentencing.

## IV. Additional Issues Pertaining to Sentencing and the Abstract of Judgment

Although this issue is not raised by the parties, the abstract of judgment indicates that, at sentencing, the trial court ordered defendant to undergo AIDS testing pursuant to section 1202.1. However, the reporter's transcript of the sentencing hearing reveals that the prosecutor declined to request AIDS testing and the trial court did not order it. Based on defendant's convictions, an order directing AIDS testing was only required under subdivision (a) of section 1202.1 "if the court finds that there is probable cause to believe that blood, semen, or any other bodily fluid capable of transmitting HIV has been transferred from the defendant to the victim." (§ 1202.1, subd. (e)(6)(A)(iii).) The court made no such finding here.

"[T]he abstract of judgment is not itself the judgment of conviction, and cannot prevail over the court's oral pronouncement of judgment to the extent the two conflict." (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070.) Thus, the oral pronouncement of judgment, during which the trial court did not order AIDS testing, controls. (*Ibid*.) Accordingly, we shall order the trial court to correct the abstract of judgment to conform to this aspect of the oral pronouncement of judgment.

Additionally, at sentencing, the trial court failed to impose any penalty assessments pursuant to, inter alia, section 1464 and Government Code section 76000 and no penalty assessments are reflected in the abstract of judgment. "The penalty assessment statutes apply to all fines collected by the criminal courts." (*People v.*

*Stewart* (2004) 117 Cal.App.4th 907, 910.)  We also note that the "[F]ailure to impose section 1464, subdivision (a) and Government Code section 76000, subdivision (a) penalty assessments is a jurisdictional error which can be corrected for the first time on direct appeal." (*Stewart*, at p. 910.)  Here, the oral pronouncement of judgment did not even contain a "shorthand reference to 'penalty assessments,' " which may be sufficient if the fines, fees, and penalties are appropriately specified in the abstract of judgment (*People v. Sharret* (2011) 191 Cal.App.4th 859, 864), let alone a "detailed description of the amount of and statutory basis for the fines and penalty assessments imposed . . ." (*People v. Hamed* (2013) 221 Cal.App.4th 928, 939).  Because we are remanding for resentencing, we further direct the trial court to impose the correct amounts in penalty assessments, and to ensure that these amounts and the statutory bases therefor appear on the abstract of judgment.

## DISPOSITION

The matter is remanded for resentencing, at which the trial court is to exercise its discretion to choose whether to impose concurrent or consecutive sentences on counts 2, 3, and 4, and, if it imposes consecutive sentences on any of these counts, to state its reasons for doing so.  The court is also to impose the correct amounts in penalty assessments, and to ensure that these amounts and the statutory bases therefor appear on the abstract of judgment.  Further, the abstract should not indicate defendant is required to submit to AIDS testing pursuant to section 1202.1.  The court shall amend the abstract of judgment accordingly and forward a certified copy to the California Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.

/s/
MURRAY, J.

We concur:

/s/
RAYE, P. J.

/s/
BLEASE, J.